J-S17013-15 & S17014-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: M.M.P., A MINOR

APPEAL OF: R.A.

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1805 WDA 2014

Appeal from the Order entered October 2, 2014,
in the Court of Common Pleas of Allegheny County, Orphans'
Court, at No(s): TPR 130 of 2013

IN RE: M.P., A MINOR

APPEAL OF: S.P.

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1806 WDA 2014

Appeal from the Order entered October 2, 2014,
in the Court of Common Pleas of Allegheny County,
Family Court, at No(s): TPR-13-000130

BEFORE:  GANTMAN, P.J., SHOGAN, and FITZGERALD*, JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED MAY 14, 2015**

R.A. ("Father"), and S.P. ("Mother") appeal from the orders entered in the Allegheny County Court of Common Pleas terminating their parental rights to their child, M.M.P., a/k/a M.P., ("Child")[1] (born in December of 2008), pursuant to section 2511(a)(1), (2), (5), (8), and (b) of the Adoption

---

* Former Justice specially assigned to the Superior Court.

[1] We note that in a separate order the trial court involuntarily terminated the parental rights of the unknown father of Child.  Order, 10/2/14.  The unknown father has not challenged the termination of his parental rights, and is not a party to this appeal.

Act.[2]  We affirm, and grant the petition to withdraw as counsel filed by Mother's counsel.

The trial court aptly set forth the factual background and procedural history of these appeals in its opinion filed on December 3, 2014, which we adopt herein.  *See* Trial Ct. Op., 12/3/14, at 3-9.  On July 31, 2013, Allegheny County Children, Youth and Families ("CYF") filed a petition for the involuntary termination of the parental rights of Father, Mother, and the unknown father of Child.  On August 13, 2013, Amy L. Berecek, Esq. entered her appearance as the guardian *ad litem* ("GAL") for Child.  Father's trial and appellate counsel, Raymond N. Sanchas, Esq. entered his appearance on behalf of Father.  On January 25, 2014, Mother's trial and appellate counsel, Marsha H. Grayson, Esq. entered her appearance on behalf of Mother.  In January of 2014, Eris Altar-Krupski, Esq. was appointed the GAL for Mother, who has a history of mental health issues.  N.T., 10/2/14, at 133.

On April 2, 2014, and October 2, 2014, the trial court held evidentiary hearings on the termination petition.  On April 2, 2014, CYF presented the testimony of Neil Rosenbum, Ph.D., a licensed psychologist, who testified, via telephone, as an expert witness through the stipulation of the parties.  N.T., 4/2/14, at 4-5.  The hearing was continued to October 2, 2014.  Mother and Father were not present at the October 2, 2014 hearing, despite

---

[2] 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

efforts to have them attend, but were represented by their counsel at the hearing. N.T., 10/2/14, at 2-6.

In orders dated and entered on October 2, 2014, the trial court terminated the parental rights of Father and Mother to Child pursuant to section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. On November 3, 2014, Mother filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On that same date, Father filed a notice of appeal and statement of errors complained of on appeal. On December 30, 2014, Mother's counsel filed a petition to withdraw as counsel and an **Anders**[3] brief with this Court.

In the **Anders** brief, Mother's counsel raises the following issues:

> 1. Whether the Trial Court erred or abused its discretion in finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that the parental rights of S.P. should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), [and] (8)[?]
>
> 2. Whether the Trial Court erred or abused its discretion in finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that terminating the parental rights of S.P. best meets the needs and welfare of the minor child M.P. pursuant to 23 Pa.C.S.A. § 2511(b)[?]

**Anders** Brief, at 1-2.

On appeal, Father raises one issue:

> Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of

---

[3] **See Anders v. California**, 386 U.S. 738 (1967).

- 3 -

proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of his child pursuant to 23 Pa.C.S.A. § 2511(b)?

Father's Brief, at 5.

We begin by addressing the motion to withdraw. *See In re X.J.* 105 A.3d 1, 3 (Pa. Super. 2014) (stating "[w]hen counsel files an *Anders* brief, this Court may not review the merits without first addressing counsel's request to withdraw.").

In *In re V.E.*, 611 A.2d 1267, 1275 (Pa. Super. 1992), this Court extended the *Anders* principles to appeals involving the termination of parental rights. We stated that counsel appointed to represent an indigent parent on a first appeal from a decree involuntarily terminating parental rights may, after a conscientious and thorough review of the record, petition this Court for leave to withdraw representation and must submit an *Anders* brief. *In re V.E.*, 611 A.2d at 1275. To withdraw pursuant to *Anders*, counsel must: 1) petition the Court for leave to withdraw, certifying that after a thorough review of the record, counsel has concluded the issues to be raised are wholly frivolous; 2) file a brief referring to anything in the record that might arguably support the appeal; and 3) furnish a copy of the brief to the appellant and advise him of his right to obtain new counsel or file a *pro se* brief to raise any additional points that the appellant deems worthy of review. *In re V.E.*, 611 A.2d at 1273. Thereafter, this Court examines the record and determines whether the appeal is wholly frivolous. *Id.*

- 4 -

Our Supreme Court, in **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009), stated that an **Anders** brief must:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361.

Mother's counsel has complied with the first prong of the test in **Santiago** by providing a summary of the procedural history and facts in her **Anders** brief. Counsel has also complied with the second prong of the test in **Santiago** by referring to any evidence in the record that counsel believes arguably supports the appeal. Counsel has also set forth her conclusion that the appeal is frivolous, and stated her reasons for that conclusion, with appropriate support. Moreover, counsel filed a separate motion to withdraw as counsel, wherein counsel states that she has made a conscientious examination of the record, and she has concluded that the appeal is frivolous. Further, counsel has attempted to identify and fully develop any issues in support of Mother's appeal. Additionally, counsel states that she sent a letter to Mother in which she provided a copy of the **Anders** brief.

Counsel states that she informed Mother that she has filed a motion to withdraw and an **Anders** brief, and she informed Mother of her rights in light of the motion to withdraw as counsel. Thus, Mother's appellate counsel has satisfied the requirements of **Santiago**.

Next, we address the first issue in the **Anders** brief, that is, whether the trial court erred in granting the termination petition because the evidence was insufficient to support the termination under section 2511(a)(1), (2), (5), (8). In reviewing an appeal from the termination of parental rights, we review the appeal in accordance with the following standard.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. **In re: R.J.T.**, [ ] 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore,

- 6 -

even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (citation omitted).

The trial court terminated the parental rights of Mother and Father under section 2511(a)(1), (2), (5), (8), and (b).[4] This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384

---

[4] We note that Father has not challenged the termination of his parental rights under section 2511(a), and has limited his challenge to the sufficiency of the evidence under section 2511(b). He avers: "Father is not contesting that there is a basis in the record to support the finding of the trial judge that grounds for termination under 23 Pa.C.S. §2511(a) were proven by sufficient evidence." Father's Brief at 12.

(Pa. Super. 2004) (*en banc*). We will focus on section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or

mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

Our Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

> As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." If and only if grounds for termination are established under subsection (a), does a court consider "the developmental, physical and emotional needs and welfare of the child" under § 2511(b).
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
> > A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

***In re Adoption of S.P.***, 47 A.3d at 827 (citation omitted).

This Court has stated:

> an agency is not required to provide services indefinitely if a parent is either unable or unwilling to apply the instruction given. The goal of intervention is to rehabilitate the family and reunite the child with his family, or to terminate parental rights and free the child for adoption, if reasonable efforts over an appropriate period of time have failed. Therefore, [the agency's] duties must have reasonable limits. If a parent fails to cooperate or appears incapable of benefiting from reasonable efforts supplied over a realistic period of time, the agency has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted.

***In re A.L.D.*** 797 A.2d at 340 (quotation marks and citations omitted).

A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***In re Z.P.***, 994 A.2d 1108, 1125 (Pa. Super. 2010) (citation omitted). Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004).

On April 2, 2014, Dr. Rosenblum testified. Maternal Grandmother has been Child' primary caregiver for approximately two years. N.T., 4/2/14, at 6. On October 16, 2012, he performed an interactional evaluation of Child and Mother and Father. ***Id.*** at 8, 11. Mother tried to relate to Child and there is no question that she loves him. ***Id.*** at 9. There is a bond between

them. *Id.* Child enjoyed spending time with both Mother and Father. *Id.* Mother's parenting skills were inconsistent because of her mental health problems. *Id.* at 10. "She's not capable of consistently maintaining an awareness of [Child] or making appropriate decisions about both short-term things, such as keeping him safe at all times, and watching him carefully as well as being able to make independent decisions about his well being." *Id.*

Father's parenting skills were fairly positive. *Id.* at 11. He related to the types of things a young boy would enjoy doing. *Id.* Child enjoyed, "at that time, a comfortable attachment and a good relationship with" Father. *Id.*

When he observed Mother and Father together, Child preferred playing with Father. *Id.* There was "a lot that [he] didn't know about Mother and Father" in terms of them parenting Child together on a long term basis. *Id.* at 11-12. Father worked a lot of hours and "Mother reported being very isolated." *Id.* at 12. Mother and Father downplayed the issue of domestic violence. *Id.* Mother would not be able to parent Child on her own. *Id.* Father "did admit to one or two incidents where he claims Mother would attack him or come after him." *Id.* at 13. Father acknowledged Mother's mental health problems and the fact that they did not have money for her medication. *Id.* Mother was inconsistent with medication and treatment. *Id.*

Father filled out a mental health questionnaire and "was highly unrealistic in his responses." *Id.* at 13-14. Father displays impulsive behavior. *Id.* at 14. He diagnosed Father has having "adjustment disorder, not otherwise specified, partner relational problem, parent/child relational problem . . . ." *Id.*

Mother's interview revealed that she had considerable mental health problems. *Id.* at 15. She appeared to be delusional at times and confused in her thought processes. *Id.* "Her judgment and insight [were] extremely poor." *Id.* Mother has "[s]chizoaffective disorder with a rule-out of psychotic disorder NOS,[5] and apparent child relational problems and schizoid personality traits." *Id.* at 16. Her global assessment of functioning score was forty-five which indicates very serious mental health concerns. *Id.* He felt he needed more information about Father's employment history and possible alcohol abuse and the relationship between Mother and Father. *Id.* at 17. They were living in Virginia and more information was needed regarding their living situation. *Id.*

He concluded "Mother's mental health problems as they presented when [he] did [his] evaluation would interfere with her—grossly interfere with her ability to take primary care of [Child]." *Id.* at 38. Father understood the severity of Mother's mental health problems but "overlooked the significance and the impact and danger to [Child]." *Id.* at 39.

---

[5] NOS stands for not otherwise specified.

Following Dr. Rosenblum's testimony, the court ordered CYF "to schedule updated interactionals and individuals on all parties . . . ." *Id.* at 46. A hearing was held on October 2, 2014. Neither Mother nor Father appeared at the hearing. N.T., 10/2/14, at 5. Dr. Rosenblum continued his testimony at the hearing. He conducted evaluations on June 23, 2014 and July 10, 2014 to assess Child's needs, relationships with Mother, Father, his grandmother and his uncle. *Id.* Father acknowledged Mother's mental health problems but was not proactive in seeing that she was in treatment and took her medications. *Id.* at 11-12. He came to see Child two weeks before the evaluation but had not seen him since Thanksgiving and Christmas of 2013. *Id.* at 12. The previous visit was close to a year prior to the visits in 2013. *Id.*

He conducted testing but the results were "lacking in validity." *Id.* at 14. Father admits to no problems or concerns "for depression, anxiety, domestic violence, alcohol use, not even any indications of sadness or regret in regard from being away from [Child]." *Id.* His diagnosis for Father was "adjustment disorder, with disturbance of conduct, rule out history of alcohol abuse, history of partner relational problems, and parent/child relational problems." *Id.* at 15.

Mother "shows very clear clinical signs of psychotic disorder, most likely schizo-affective disorder, which combines schizophrenic symptom along with episodes of mania, and likely depression as well." *Id.* at 16. She

saw Child two to three times a year. *Id.* at 18. She denied having any friends in Virginia where she lives. *Id.* She associates with her Mother-in-law who lives in Virginia. *Id.* The testing results for her were "rather invalid." *Id.* at 19. Mother responded on some tests "no" to every question or "true to every question . . . ." *Id.* He diagnosed her with "[s]chizo-affective disorder, bipolar type, parent/child relational problem, history of partner relational problem, and schizo and independent personality traits." *Id.* at 20. Her GAF score was fifty, indicating "severe difficulty in personal functioning." *Id.*

Two and one-half years have transpired since child came into care and "it's clear . . . that Mother is definitely not capable of caring for" Child "and that her mental health problems remain very serious, and largely not improved." *Id.* at 30.

Christopher Michael Ciccarelli, family service caseworker for CYF testified. *Id.* at 51-52. There were no services offered to Mother by CYF because she was living in Virginia and CYF cannot provide services out of state. *Id.* at 65, 102. CYF was ordered to do an Interstate Compact[6] with Virginia and it was done November 5, 2012. *Id.* at 62. On January 16, 2013, it was closed due to lack of cooperation between the family. *Id.* When Child was removed from Mother, Father was in Virginia. *Id.* at 117.

---

[6] *See* Interstate Compact on the Placement of Children, 62 P.S. § 761.

He was not providing care for Child. *Id.* at 118. Mother and Father were both in Virginia Beach as of May 25, 2012. *Id*. at 119.

After our careful review of the record in this matter, we find that the trial court's determinations are supported by competent evidence in the record. *See In re Adoption of S.P.*, 47 A.3d at 826-827; *In re Adoption of M.E.P.*, 825 A.2d at 1272. Accordingly, we find that the trial court's determinations regarding section 2511(a)(2), with regard to Mother and Father, are supported by sufficient evidence in the record. *See In re R.N.J.*, 985 A.2d at 276.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are satisfied. *In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *Id.* at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and

- 15 -

child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

This Court has stated:

> Being a parent means assuming responsibility so that a real bond develops, not just having a casual relationship with one's children. Children often know, love, and sometimes have an enjoyable time with parents who have little to do with their upbringing, and even with parents who physically and mentally abuse them. The key is whether a bond has developed.

*In re J.L.C.*, 837 A.2d 1247, 1249 (Pa. Super. 2003).

We have stated that, in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d at 1121. In *In re K.Z.S.*, 946 A.2d 753 (Pa. Super. 2008), this Court observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *Id.* at 764.

Dr. Rosenblum testified that he did an interactional evaluation of Child with Maternal Grandmother. N.T., 10/2/14, at 20. She had been the primary caregiver for approximately two years since Child was removed from Mother's care in May of 2012. *Id.* at 21. Prior to the evaluation Child was primarily residing with Uncle. *Id.* Grandmother takes care of Child while Uncle is working. *Id.* Child and Uncle have "an exceptionally close

- 16 -

relationship." *Id.* at 25. Child views Maternal Grandmother and Uncle as his primary caregivers. *Id.* at 37.

The trial court found "[t]o the extent that [Child] has a bond or attachment to his parents, it is based only on memories and is in fact residual, and apparently only evidenced by how well he gets along with them at the interactionals. [Child] clearly recognizes his Uncle and Grandmother to be his primary caregivers. The stronger bond and attachment is to them." Trial Ct. Op. at 8. Mother and Father did not put themselves in a position to assume daily parenting responsibilities for Child so that they could develop a real bond with Child. *See In re K.Z.S.*, 946 A.2d at 764. Father and Mother resided in Virginia, and allowed Child to remain in Pennsylvania, first in the care of Maternal Grandmother for approximately a year and a half, and, later, with Uncle, who wishes to adopt him. *See In re J.L.C.*, 837 A.2d at 1249.

This Court finds competent evidence in the record to support the trial court's determinations that Child's needs and welfare are being provided by Uncle. We conclude that both Mother's and Father's appeals lack merit as to section 2511(b). *See In re: T.S.M.*; 71 A.3d at 267; *In re Adoption of S.P.*, 47 A.3d at 826-27. Accordingly, we affirm the orders terminating the parental rights of Mother and Father pursuant to Section 2511(a)(2) and (b).

Further, we have reviewed the *Anders* brief. We have found the trial court had sufficient evidence upon which to terminate Mother's parental

rights, and that her appeal is frivolous. Accordingly, we grant the motion to withdraw filed by Mother's counsel.

Orders affirmed. Motion to withdraw granted.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/14/2015

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

RE: IN THE INTEREST OF: M.P. a.k.a.
M.M.P., minor child

APPEALS OF: R.A., natural father;
S.P., natural mother

:
:
:
:
:
:
:
:
:
:
:

**CHILDREN'S FAST TRACK APPEAL**

OPINION

Docket No.: JV-12-1114
TPR No.: 13-130
1805 WDA 2014 & 1806 WDA 2014

BY:
Honorable Kathryn Hens-Greco
440 Ross Street
Suite 5077
Pittsburgh, PA 15219

COPIES TO:

Counsel for Allegheny County
Children, Youth and Family Services:
Paula J. Benucci, Esq.
Fort Pitt Commons, Suite 101
445 Fort Pitt Blvd
Pittsburgh, Pa 15219

Counsel for M.P. as Guardian ad Litem:
Amy Lynn Berecek, Esq.
Kids Voice
437 Grant Street, Suite 700
Pittsburgh, Pa 15219

Counsel for S.P.:
Marsha Grayson, Esq.
Grayson Law Firm, LLC
401 Wood Street
Pittsburgh, PA 15222

Counsel For R.A..
Raymond Sanchas, Esq.
Juvenile Court Project
436 Seventh Avenue, Fl 11
Pittsburgh, Pa 15219

FILED
2014 DEC -3 PM 2: 35
DEPT. OF COURT RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| RE: IN THE INTEREST OF: M.P. a.k.a. M.M.P., minor child | : | **CHILDREN'S FAST TRACK APPEAL** |
| | : | |
| | : | Docket No.: JV-12-1114 |
| APPEALS OF: R.A., natural father; | : | TPR No.: 13-130 |
| S.P., natural mother | : | 1805 WDA 2014 & 1806 WDA 2014 |
| | : | |
| | : | |

OPINION

HENS-GRECO, J.                                                               December 3, 2014


On October 2, following a one-day[1] hearing on the above captioned matter in which neither parent appeared[2] but was represented by counsel, this Court issued an order granting the petition of the Allegheny County Office of Children, Youth and Families ("CYF") for involuntary termination of the parental rights of R.A. ("Father"), the natural father of M.P. (DOB 12/19/2008) and of S.P. ("Mother"), the natural mother of M.P., pursuant to 23 Pa. C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and 2511(b). For the reasons set forth below, the Order of this Court terminating parents' rights to the child M.P. should be affirmed.

---

[1] The trial was initially scheduled for April 2, 2014. At said date, testimony from psychologist Dr. Neil Roseblum revealed that updated interactional evaluations would better assist the Court in making a determination. *See* Testimony of Transcript, dated April 2, 2014, at 45. The case was continued until August 20, 2014, where it was continued again to October 2, 2014. Both parties received notice of the October 2, 2014 hearing date as indicated by their counsel. *See* Testimony of Transcript, October 2, 2014, at 5-6.

[2] The CYF Caseworker and Mother's GAL indicated that Mother was aware of the TPR hearing, but that she had apparently been recently released from the hospital and could not attend. *See* Transcript of Testimony, at 3-4. She also indicated, however, that she did not want to testify by phone. The Caseworker testified that, according to Mother, Father forgot about the hearing. *Id.*, at 80. The Caseworker also testified that Mother was very amicable to her brother adopting M.P., but that her only request was that she wants to see M.P.

1

CYF based its petition to terminate Father's parental rights on 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5), and (a)(8). These subsections provide for the involuntary termination of parental rights if the petitioner can establish any of the following grounds:

(a)(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. [...]

(a)(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. [...]

(a)(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. [...]

(a)(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and the termination of the parental rights would best serve the needs and welfare of the child.

23 Pa. C.S.A. §§ 2511 (a)(1), (a)(2), (a)(5), (a)(8). Once the statutory grounds for involuntary termination of parental rights have been clearly shown, the Court must consider whether the termination would meet the needs and welfare of the child under subsection §2511(b):

(b) Other considerations. – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions.

2

23 Pa. C.S.A. § 2511 (b). A party seeking termination of parental rights must establish by clear and convincing evidence that the parent's conduct satisfies at least one of the statutory grounds for termination; if it is determined that this burden of proof has been met, then the trial court must next consider the second step of the process, which entails a determination of whether termination best serves the needs and welfare of the child. *In re S.D.T., Jr.,* 934 A.2d 703 (Pa. Super. 2007). In reviewing an order terminating parental rights, the appellate court "is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re S.H.,* 879 A.2d 802, 809 (Pa. Super. 2005). Furthermore, the trial court is "the sole determiner of the credibility of witnesses and resolves all conflicts in testimony." *Id.*

With the above standards in mind, and based on the testimony of three witnesses at trial (CYF Caseworker Christopher Ciccarelli, psychologist Dr. Neil D. Rosenblum, and Mother's guardian *ad litem* Eris Atar-Krupski), the Court found the following facts, which persuaded the Court that grounds for termination had been firmly established:

The family came to the attention of CYF on May 9, 2012 following allegations that the child's welfare was in jeopardy after Mother had locked herself and M.P. in a closet in the home of Maternal Grandmother. *See* Transcript of Testimony ("T.T."), dated October 2, 2014, at pages 58-59. It became immediately apparent to CYF that Mother had mental health issues. During the initial incident, Mother made allegations about the Secret Service, x-rays, and satellites for 20-30 minutes. *Id.*, at 59. Mother refused to let the authorities look at the child so that they could ensure his health and safety. The child was also very tiny and unclean. *Id.* CYF was also concerned about his nutrition. *Id.* CYF obtained an Emergency Custody Authorization to remove the child. *Id.* Mother was involuntarily committed to the psychiatric unit at McKeesport Hospital. *Id.*; *Id.*, at 61. M.P.'s shelter hearing was held on May 11, 2012.

3

The child was placed in the home of Maternal Grandmother; upon her release, Mother returned to Virginia to be with Father. The child was never in either of the parents' custody again. Rather, M.P. lived with his Maternal Grandmother for roughly a year and a half until it became apparent that Maternal Grandmother, due to health concerns, could not be a full time pre-adoptive resource. At that point, Uncle, Mother's bother, made himself available. He has been the primary caregiver since.

In her Statement of Errors, Mother quite broadly argues: "1. The Trial Court erred in finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that the parental rights of ["Mother"] should be terminated pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b). *See* Mother's Notice of Appeal and Statement of Errors, at ¶1.

Father's Statement of Errors is narrower: "1. The trial court abused its discretion and/or erred as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S. §2511(b). Such termination immediately, permanently and unnecessarily deprives the child of the love, companionship and affection of his biological father with whom he is bonded. 2. The trial court abused its discretion in terminating Father's parental rights when a more appropriate and less restrictive option of Subsidized Permanent Legal Custodianship was available." *See* Father's Concise Statement of Errors Complained of on Appeal, at ¶¶1-2.

M.P. was adjudicated dependent on July 23, 2012. *See* T.T., at 56. CYF sought to file under "Aggravated Circumstances" as the parents left the Commonwealth and thus failed to maintain substantial and continuing contact for a period of six months. *Id.*, at 63. As such CYF was relieved of the requirement that it make reasonable efforts to reunify the parents with the child. *Id.* Still, CYF did establish multiple Family Service Plans ("FSPs") so as to facilitate reunification. *Id.*, at 64. And because the parents lived in Virginia, CYF sought to obtain the assistance of its Virginia counterpart via an Interstate Compact. The

4

Interstate Compact was initiated on November 5, 2012, but the parents refused to cooperate and so the potential for services in Virginia ended in January 2013. *Id.*, at 62. Nevertheless, CYF established FSP "Goals" to aid the parents' reunification.

The parents' first goal was to work with the agency and agency providers. *Id.*, at 65. The second goal was to ensure that the child was supervised at all times. *Id.*, at 68. This meant that the parents were to identify appropriate caregivers and to obtain and maintain a bond with the child through regular visits. *Id.*, at 68-69. The third goal was to maintain contact and cooperation with agency and service providers. *Id.*, at 78. The fourth goal provided that Mother and Father will obtain a mental health and drug and alcohol assessment, and follow any and all recommendations. *Id.*, at 85. The parents were to attend counseling to address any and all anger management concerns. *Id.* Both were to successfully complete any appropriate parenting classes. *Id.*

Mother and Father largely did nothing. Neither parent worked with the agency nor sought agency approved services. CYF was unable to contract directly for services in Virginia where the parents lived. *Id.* As to whether the parents' identified appropriate alternative caregivers, CYF argues that the parent's did not so identify. Rather, the responsibility was left to CYF when it was forced to place the child with Maternal Grandmother due to lack of parental care. *Id.*, at 107. That Mother and Father apparently acquiesced to the placement is immaterial. Having said that, this issue is not as concerning to the Court as is the issue of visitation. Since the child was removed from Mother in May 2012, the parents have seen the child less than a handful of times. After the child was removed and Mother was released from the hospital in May 2012, she left the Commonwealth and went to be with Father in Virginia. She did not visit the child until October 2012. *Id.*, at 71. The next visit came in December 2012. The next was on August 19, 2013. *Id.*, at 72. After that, Mother spent a couple of weeks in Pittsburgh - from November 19, 2013 until December 7,

5

2013 – following a physical fight between Mother and Father. *Id.*, at 72-74. The parents appeared at the first scheduled day of the present TPR hearing on April 2, 2014. They also submitted to an evaluation conducted by Dr. Rosenblum in June 2014. *Id.*, at 75. Mother purportedly makes regular phone calls to M.P., though as discussed below, phone calls are an inadequate substitution for regular physical visits. The visitation goal was not achieved.

In terms of the contact and cooperation goal, the CYF caseworker noted that Mother does make calls to the agency. *Id.*, at 78. However, cooperation is limited. For one thing, Father leaves the responsibility of contacting CYF to Mother. *Id.*, 92. While the parents live together, Mother's mental limitations prevent her from being particularly cooperative. Mother was appointed a GAL, who testified that because Mother lives out of state, the GAL could not be as effective as she could be for other clients. Although the GAL noted that she attempted to facilitate cooperation between CYF and Mother, the GAL testified that Mother was unable to follow through with a requested task. *Id.*, at 142. The issue here is medical release forms. CYF sought to verify that Mother was obtaining and maintaining appropriate mental health treatment. Because Mother resided in Virginia, CYF had an even harder time verifying that Mother's treatment was legitimate. Mother could have verified that she was in treatment by signing the releases, but she did not do so. Mother indicated that she would, but evidently because of her mental state she did not. Her GAL sought to aid Mother but to no avail. And thus, not only was Mother "uncooperative" in terms of the third FSP goal, but it also must be noted that she was unable to achieve her fourth goal: address mental health issues through appropriate treatment.

Mother's mental health problems are rather significant. Dr. Rosenblum testified that Mother shows very clear clinical signs of a psychotic disorder, most likely schizo-affective disorder, which combines schizophrenic symptoms along with episodes of mania and likely depression. *Id.*, at 16. Her thinking tends to be very confusing and disjointed. *Id.* She cannot stay focused. *Id.* She has difficulty concentrating and

6

responding effectively to questions. *Id.* Dr. Rosenblum also has concerns about Father. Though Father acknowledged Mother has some emotional problems, he denies that it impairs Mother's ability to function. *Id.*, at 11-12. He does not believe that he has ever had any problems with drugs, alcohol or anger management, or domestic violence, despite credible allegations of such. *Id.*, at 11. The parents' lack of cooperation with the agency or ability to stay consistent with treatment poses serious concerns. Father told Dr. Rosenblum that he tries to see M.P. when he can. But this translates to less than a handful of times over the course of two and a half years. Dr. Rosenblum testified that this shows either a lack of motivation or a lack of awareness or both. *Id.*, at 13. Father either does not know what M.P.'s needs are, or he knows but does not care. *Id.* This lack of awareness and lack of motivation is also what led to the child's removal. It is also why the child is still out of Father's care for over two years.

Mother did not complete a mental health assessment. *Id.*, at 85. She was able to provide two unsubstantiated letters that she completed a parenting class and that she was participating in mental health services in Virginia. *Id.*, at 86-87. But even that documentation was, if not suspect, devoid of any substantial information . CYF could not assess whether Mother had been in meaningful and consistent treatment, let alone whether that treatment resulted in improved functioning. *See Id.*, at 114-115. Dr. Rosenblum read Mother's documentation to mean that Mother was in therapy less than fifty percent of the recommended treatment course. *Id.*, at 47. What is more, such documentation came not only after CYF filed for termination, but after the first day of the present TPR hearing. *See Id.*, at 66. *See also* Footnote 1, *infra.* Mother's mental instability should not be understated as it was the reason for the child's removal and the reason why Mother has been unable to reunify with her child after two years.

This Court notes Mother's inability to comply with any of the FSP Goals illustrates that the conditions which led to M.P.'s removal are still in place, that Mother is either unable or unwilling to remedy these conditions, and that the statutory timeframe for such remedy has passed. As Father does not

7

appeal the §2511(a) aspects of this Court's termination decision, the Court need not speak to his lack of compliance, except to note that it is as dismal as Mother's if not more so.

The crux of the appeal, for both Mother and Father, is truly the §2511(b) analysis. That is, whether termination of the parents' rights was in M.P.'s best interests. Father argues a secondary, related issue of whether the Court erred because it chose to terminate rather than find a Subsidized Permanent Legal Custodianship (SPLC) arrangement. The record is clear and the evidence is convincing that termination is in M.P.'s best interests and that such an arrangement is far better than an SPLC.

Following his removal in May 2012, M.P. resided primarily with his Maternal Grandmother. At the time, M.P. was 3 years old. After spending approximately a year and a half with Grandmother, it became clear Grandmother could not adopt M.P. *Id.*, at 33. For one thing, she was diagnosed with cancer. *Id.*, at 26. She also had other health concerns. Finally, she also wanted to keep open the possibility that Mother might return to Pittsburgh and that she might help Mother address her mental health. *Id.*, at 40. Since such time, M.P. has resided primarily with his Uncle, Mother's Brother. *Id.*, at 33. Though Dr. Rosenblum was initially apprehensive of this arrangement, after an interactional evaluation in June, Dr. Rosenblum now recommends termination of the parents' rights and adoption by Uncle.

According to Dr. Rosenblum, M.P.'s attachment with his parents is residual and not strong. *Id.*, at 39; 37. *See* also Exhibit 2. He remembers his parents and is happy to see them. But he does not have an active attachment to them. *Id.*, at 37. M.P. does not look to Mother to take care of him. *Id.* For two and a half years, neither parent has been in any kind of regular contact with M.P. *Id.* Meanwhile, Grandmother has played a strong role in the child's life. *Id.* She continues to do so even as Uncle has taken the primary parent role. Dr. Rosenblum said Uncle "stepped up to the plate." *Id.*, at 24. Dr. Rosenblum testified that his interactional evaluation with Uncle revealed "clear progress" and that he was "very impressed" with Uncle, who feels very emotionally invested in M.P. *Id.*, at 25. M.P. is learning to view Uncle as an

8

authority figure similar to Grandmother. *Id.* M.P. enjoys playing with Uncle, who naturally has more energy than Grandmother. *Id.*, at 26. Dr. Rosenblum found Uncle to be capable, mature and responsible. *Id.*, at 27.

To the extent that M.P. has a bond or attachment to his parents, it is based only on memories and is in fact residual, and apparently only evidenced by how well he gets along with them at the interactionals. M.P. clearly recognizes his Uncle and Grandmother to be his primary caregivers. The stronger bond and attachment is to them. It is true that Mother maintained regular phone contact with M.P., but Dr. Rosenblum explained why such contact is really not a substitute. Even Skype, which Mother does not have, is not the sort of face-to-face contact that M.P. needs to establish an attachment. *Id.*, at 13. Had M.P. been an older child, who lived with his biological parents some time longer, then maybe such regular phone contact could be influential. But that is not the case here. Per §2511(b), termination is in M.P.'s best interests.

Finally, Father argues that an SPLC would be a better option for M.P. *See* Father's Statement, at ¶ 2. But an SPLC cannot be a viable option in this case, because it does not offer the permanence that M.P. needs. *Id.*, at 39. An SPLC could be challenged down the road by either parent, whereas adoption clearly points to a long-standing permanent resolution. *Id.* In other words, M.P. would not be given a clear-cut sense of closure, an understanding of who is going to be his primary parent figure for the duration of his childhood, and adolescent years. *Id.* Besides, Dr. Rosenblum notes that adoption is unlikely to jeopardize the Mother's ability to maintain contact with the child, as he will be living with her brother and visiting with her mother. *Id.*, at 40. An SPLC arrangement has the potential to cause disruption down the road. Dr. Rosenblum testified that if Mother's mental health stabilized, and then later in life sought custody of M.P., it would add to M.P.'s confusion. *Id.*, at 41. Adoption leaves the door open for Mother while at the same time ensuring that M.P. has permanency. *Id.*, at 41-42.

9

After a careful review of all the evidence set forth above, this Court concluded that CYF had carried the burden of proving by clear and convincing evidence that the parents' rights should be terminated and that the child's best interests will be served thereby. For these reasons, the decision of the Court should be affirmed.

BY THE COURT:

_____, J.

10